## NATIONAL BANK *v.* CITY BANK.

Pursuant to orders received from A., the owner of the Corn Exchange Elevator at Oswego, who was engaged in storing grain for the public and doing business on his own account, B. bought for him two cargoes of wheat, and drew sight and time drafts for the purchase-money. C., a bank at Milwaukee, bought the drafts and received the bills of lading. The latter describe B. as the shipper, and, by their terms, each cargo was to be delivered at Oswego to the account or order of D., cashier of C., care of the City Bank. C. thereupon enclosed the drafts and bills of lading to the City Bank, saying, "On payment of the drafts you will deliver the cargo to the order of A. If not paid, please hold and advise by telegraph." The bank acknowledged their receipt, and presented the sight-drafts to A., who paid them, and accepted the time-drafts. Upon the arrival of the wheat at Oswego, the master of each vessel reported to the cashier of the City Bank, who, knowing that A. was the owner of the Corn Exchange Elevator, indorsed the bills of lading: "Deliver to the Corn Exchange Elevator for account of D., cashier, Milwaukee, subject to the order of the City Bank, Oswego." After the wheat had been so delivered, A. sold and shipped it. In its account with C., the City Bank made a charge for its trouble beyond the customary percentage for collecting and remitting the proceeds of the drafts. Before the time-drafts became due, A. failed. They were duly protested for non-payment, and have not been paid. In an action by C. against the City Bank, — *Held*, 1. That the City Bank, in receiving and acknowledging the drafts and bills of lading, with the accompanying instructions, became the agent of C. in the business which it had undertaken. 2. That whether, in discharging its duties as such agent, it exercised reasonable diligence and care, is a question for the jury, which the court below should not have withdrawn from them and decided.

ERROR to the Circuit Court of the United States for the Northern District of New York.

The facts are stated in the opinion of the court.

*Mr. H. M. Finch* for the plaintiff in error.

*Mr. Albertus Perry, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

A. F. Smith & Co. were the owners of the Corn Exchange Elevator of Oswego, N. Y., in which they were engaged in the general business of elevating and storing grain for the public. They were also large dealers in grain on their own account. In September, 1869, Mower, Church, & Bell, commission merchants in Milwaukee, received orders from Smith & Co. to purchase for them two cargoes of wheat, and to draw on them for the purchase-money against each cargo. The cargoes were

bought, and sight-drafts for part of the purchase-money and time-drafts for the balance were, in each instance, drawn on A. F. Smith & Co.

The Milwaukee National Bank purchased these drafts, and received also the bills of lading for the wheat. They describe Mower, Church, & Bell as the shippers, and, by their terms, the cargo, in each case, is to be delivered at Oswego to the account or order of T. L. Baker, cashier of the Milwaukee Bank, care of the City Bank of Oswego.

The Milwaukee Bank enclosed the drafts and the accompanying bills of lading to the City Bank of Oswego, with instructions about insurance, and added, " On payment of the drafts you will deliver the cargo to the order of Messrs. Smith & Co. If not paid, please hold and advise by telegraph. Messrs. Smith & Co. will pay all expenses."

The letter and enclosures were duly received and acknowledged by the City Bank, and on presentation to A. F. Smith & Co. they paid the sight-drafts and accepted the time-drafts.

When the vessels arrived at Oswego the masters promptly reported to Mannering, the cashier of the City Bank, who made the following indorsement on each bill of lading held by the masters : —

" Deliver to the Corn Exchange Elevator, for account of T. L. Baker, cashier, Milwaukee, subject to order of the City Bank, Oswego.

" Oct. 9, 1869.                    D. MANNERING, *Cashier.*"

A. F. Smith & Co. sold and shipped the wheat after it had been put in their elevator, and shortly thereafter they failed. When the time-drafts fell due, they were duly protested for non-payment, and have never been paid.

The Milwaukee Bank sued the City Bank to recover the loss on the drafts, on the ground that the City Bank had delivered the wheat to Smith & Co. before the drafts were paid, contrary to the instructions which accompanied the drafts and bills of lading. All the evidence is embodied in the bill of exceptions, and on the case, as there made, the court instructed the jury to find a verdict for the defendant, which was done. It is this instruction which is assigned for error by the plaintiff.

The City Bank, in receiving the drafts and bills of lading with instructions to deliver the wheat to A. F. Smith & Co., on payment of the drafts, and acknowledging the receipt of these drafts, became the agent of the Milwaukee Bank in the business which it had undertaken. Whatever obligation might, under other circumstances, be imposed on the bank by its consent to receive the drafts and bills of lading, it, in the present case, received them with instructions which the bills of lading empowered it to execute; namely, to control the possession of the wheat until the drafts on Smith & Co. were paid. In acknowledging the receipt of these papers the cashier says: " We prefer, *after this,* not to receive B. L. (meaning bill of lading) when we have to look after the property." This is an implied admission that they were to look after the property, and would do so in the case to which the letters related. The bank also undertook to discharge this duty when the masters of the vessels, presenting themselves and cargo to the cashier of that bank for delivery, were directed by him in writing to deliver to the Corn Exchange Elevator. It, therefore, undertook to discharge a duty as agent of the Milwaukee Bank in regard to the custody of the wheat, under instructions that it should deliver it to Smith & Co. on payment of the drafts. There is evidence tending to show that the City Bank, in its account with the Milwaukee Bank, made an additional charge or percentage for their trouble beyond the customary charge for collecting and remitting proceeds of the drafts. So that it undertook a duty for which it received and intended to exact compensation.

What, then, is the measure of its obligation as such agent to the plaintiff?

We suppose that there can be no question that it should use due care and diligence in performing the task which it had undertaken.

One of the clear duties of an agent, under such circumstances, is to obey instructions, if by a reasonable exercise of diligence and care they can be obeyed.

We think the instructions in this case very clearly implied that the bank, which by the bill of lading was invested with the full right to the possession of the wheat, should not deliver

it to A. F. Smith & Co., except upon payment of the drafts, —
that is, of all the drafts drawn against each cargo of wheat.
The reasons for this are very plain.    The wheat had been
bought by Mower, Church, & Bell in Milwaukee for A. F.
Smith & Co., but they had to raise the money to' pay for it by
drafts on the latter.    These drafts could only be negotiated
by placing the control of the wheat in the hands of the pur-
chasers of the drafts as security for their payment.    The sight-
drafts were paid by Smith & Co. when the wheat arrived in
Oswego.    They had thus paid that much money on the pur-
chase.    They were to pay all expenses.    There remained unpaid,
however, the time-drafts; and the instruction of the Milwaukee
Bank to its agent, the City Bank, was not to part with the
possession and control of this wheat to Smith & Co. until those
drafts were paid.    It was the only security ·which the bank
had for their payment, and it was ample.

As we have already said, A. F. Smith & Co. were the own-
ers and managers of the Corn Exchange Elevator.    It is proved
that the officers of the bank knew this.    The cashier of the
City Bank, therefore, knew that when he made the order on
the bills of lading for the delivery of the wheat to the Corn
Exchange Elevator, he was ordering its delivery to A. F. Smith
& Co.    It was by reason of this delivery and the failure of
Smith & Co. that the amount of the drafts was lost to plaintiff.

Did the defendant, therefore, under the circumstances of the
case, exercise due care and diligence in storing this wheat in
the Corn Exchange Elevator?

The judge took this question from the jury and decided it in
favor of the defendant.    We are of opinion that in this the
court erred.    We do not decide here that the defendant was
negligent.    We think there was evidence on which that ques-
tion should have been left to the jury.    We think it should
still be left to a jury.

It was said in answer to this view of the subject that the
bank had no warehouse or other place of its own in which to
store the wheat, and that this was known to the Milwaukee
Bank, which must, therefore, have known that the City Bank
would be compelled to store it with some one until the drafts,
which had some time to run, should be paid.    That Smith &

Co. were supposed to be safe and solvent men engaged in that business, of good reputation, and that all wheat received under such circumstances in Oswego was deposited in elevators. These are circumstances for the jury to consider. On the other hand, it is to be said that there were other elevators in Oswego, not owned by Smith & Co., ready to receive the wheat. To some of these it could have been delivered without danger of complicating the possession as bailee, with possession under claim of ownership. And this is important, for there are laws making the embezzlement of property, when held as bailee by warehousemen and elevators, a criminal offence. It would be more difficult to convict Smith & Co. of embezzlement for selling this wheat when it had been bought for them, part of the money paid for it by them, and when they had accepted negotiable drafts for the remainder of the purchase-money, and when in fact it was their property, subject only to the payment of their outstanding drafts.

Was it acting with ordinary prudence to hazard the security which possession of the wheat gave, by delivering it to the very party to whom his principal had directed him not to deliver it? It further appears that the defendant bank took no receipt from Smith & Co., showing that they held it as bailees, but left that to stand on the indorsement they made on the bills of. lading in the hands of the masters of the vessels, and a simple acknowledgment of the receipt of the wheat by A. F. Smith & Co. on the same bills of lading. One of the firm of Smith & Co. swears that no warehouse receipt was given.

There was a plain course to be pursued, which involved no difficulty or trouble, namely, storing the wheat in some other elevator or warehouse until A. F. Smith & Co., on payment of the acceptances, should call for it. This course would not have involved a departure from their instruction not to deliver to Smith & Co. until the drafts were paid, and would have saved all parties from loss.

Some question is made in the argument as to the effect of proceedings taken by plaintiff to recover the wheat or its value of parties who bought or received it from A. F. Smith & Co. It is only necessary to say, if the jury shall be of opinion that defendant was negligent in delivering the wheat to A. F. Smith

& Co., it is responsible to plaintiff for the amount of the unpaid drafts, less any sum not actually recovered from others.

Without further comment, we are of opinion that there was evidence of negligence or want of due care on the part of defendant, which, taken in connection with the positive instruction of the plaintiff, should have been submitted to the jury. The judgment of the Circuit Court will, therefore, be reversed, with instructions to grant a new trial.

*So ordered.*