# RUSSO–CHINESE BANK *v.* NATIONAL BANK OF COMMERCE OF SEATTLE, WASHINGTON.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 244. Argued April 13, 14, 1916.—Decided June 5, 1916.

In an action by a bank in Port Arthur to recover money, remitted by it to a bank in Seattle for a draft secured by shipping documents sent to it for collection by the Seattle Bank, and which the Port Arthur Bank declared had not been paid, but for which it remitted on agreement of the Seattle bank to refund in case non-payment was proved, the jury found a general verdict in favor of the Seattle Bank and also a special finding to the effect that the Port Arthur Bank did receive payment for the draft in question; such special finding was based on testimony to effect that the Port Arthur Bank permitted the consignee to take possession of the goods covered by the documents attached to the draft on his agreeing to deposit the proceeds thereof as sold, and an instruction to the effect that such action on the part of a bank receiving a draft for collection constituted a payment in law; judgment being entered thereon and affirmed by the Circuit Court of Appeals, this court reviewing on certorari *held* that:

The fair import of the instructions of the trial judge in their entirety, being that the finding of payment was to be reached only in case the value of the goods was not less than the amount of the draft, there was no error therein.

Where a bank, holding a draft for collection with documents annexed and with instructions to deliver the documents only on payment, allows the drawee to take the goods covered by the documents on his promises to sell and account for proceeds, it amounts to a misappropriation of the property and liability to account for its value immediately arises.

There was no error in charging that the collecting bank became invested with the ownership of the goods and could not be excused from obligation to account by declaring that the goods had disappeared without its knowledge, the charge not being to effect that the relation of vendor and vendee did exist, but that the relation of principal and agent did exist, and, as such agent, the col-

lecting bank was obligated to act in good faith to protect the rights of the owner of the draft.

The special finding being supported by adequate evidence is controlling.

Even if a bank, sending a draft for collection, suffers no loss on account of its guaranty from the original owner, it may, in view of its relation to commercial paper, demand, as principal, an accounting from its correspondent, and resist an action to recover back the money which it received upon the draft.

206 Fed. Rep. 646, affirmed.

THE facts, which involve questions relating to a transaction between two banks, regarding drafts and documents annexed thereto, are stated in the opinion.

*Mr. Warren Gregory*, with whom *Mr. W. H. Chickering* and *Mr. George H. Whipple* were on the brief, for petitioner:

The instruction that permission given Clarkson & Co. to take the flour constituted a payment of the draft is manifestly erroneous.

The court in declaring that certain acts would constitute payment of the draft practically directed a special verdict.

The trial court proceeded upon the assumption that there was a novation; and the pleadings do not count on a novation nor was the case tried on the theory of novation.

The conduct of the parties is inconsistent with such theory.

If the Port Arthur branch did, contrary to instructions, permit Clarkson to take over the flour, it may have been responsible to the extent of the security released, but the jury is entitled to pass upon the question as to the value of the flour taken and there is no evidence that any of the flour was actually taken.

The only fair intendment of the instruction leads to an absurdity.

The trial court had in mind that it was not the release of the security that would pay the debt *pro tanto*, but the application of the proceeds.

The error of the trial court was only emphasized by another instruction given and the special verdict did not cure the error, but was authority for the special verdict.

The instruction that the collecting bank became invested with title and ownership of the flour, and its obligation in this regard, is erroneous. The refusal to charge that the duty of collecting bank was one of agent was error.

The Port Arthur branch was not the owner of the flour but its relationship was principal and agent, as is shown by the documents.

The instructions of the trial court placed on the Port Arthur bank the same obligations as if it had agreed to buy the flour from the Seattle bank.

The instructions of the trial court would place on the Port Arthur branch a responsibility foreign to banks handling documents for collection.

The draft in question was accepted by Clarkson & Co., and they became the principal debtors.

The court erred in permitting evidence of a so-called custom concerning the duties of a collecting bank.

Usage or custom cannot be invoked in contradiction of an express contract.

Certain of the testimony of witnesses Davidson and Short was prejudicial to petitioner.

The respondent has not been damaged by any acts of negligence on the part of petitioner.

In support of these contentions see *Alden* v. *Camden Anchor-Rockland Mach.*, 78 Atl. Rep. 977; *American Thresherman* v. *Motor Co.*, 141 N. W. Rep. 210; *Armour & Co.* v. *Russell*, 144 Fed. Rep. 614–616; *Atchison, T. & S. F. Ry.* v. *McClurg*, 59 Fed. Rep. 860; *Balbach* v. *Frelinghuysen*, 15 Fed. Rep. 675; *Bancroft* v. *Bancroft*, 110 California, 374; *Bank* v. *Monongahela Bank*, 126 Fed. Rep. 436; *Barton Seed Co.* v. *Mercantile Bank*, 160 S. W. Rep. 848; *Boston & Albany R. R.* v. *O'Reilly*, 158 U. S. 334; *Charles* v. *Carter*, 36 S. W. Rep. 396; *Commercial Bank* v.

*First State Bank,* 153 S. W. Rep. 1175; *Commercial Nat. Bank* v. *Armstrong,* 39 Fed. Rep. 684; *Deery* v. *Cray,* 5 Wall. 795; *Dickerson* v. *Wason,* 47 N. Y. 439; *Elm Lumber Co.* v. *Childerhose,* 83 S. E. Rep. 22; *Gregg* v. *Bank of Columbia,* 52 S. E. Rep. 195; *Hambro* v. *Casey,* 110 U. S. 216; *Hunt* v. *Nevers,* 32 Massachusetts, 504; *Hyde* v. *Booraem,* 16 Pet. 169; *Ladd Bank* v. *Commercial Bank,* 130 Pac. Rep. 975; *LeCoux* v. *Eden,* 2 Doug. 594; *Midland Nat. Bank* v. *Brightwell,* 49 S. W. Rep. 994; *Nat. Bank* v. *Merchants' Bank,* 91 U. S. 92; *Nebraska &c.* v. *First Nat. Bank,* 110 N. W. Rep. 1019; *Pac. Brokerage Co.* v. *Rushfeldt,* 171 S. W. Rep. 976; *Scott* v. *Ocean Bank,* 23 N. Y. 289; *Second Nat. Bank* v. *Bank of Alma,* 138 S. W. Rep. 472; *Smith* v. *Nat. Bank,* 191 Fed. Rep. 226; *Tyson* v. *Western Nat. Bank,* 26 Atl. Rep. 520; *Union Bank* v. *Stafford,* 12 How. 327; *Warren* v. *Suffolk Bank,* 10 Cushing, 582; *Wharton* v. *Walker,* 4 B. & C. 164; *Wisconsin Bank* v. *Bank of North America,* 21 Upper Canada Rep. 284; 21 Amer. & Eng. Enc. of Law, p. 661; Grant on Banking, 6th ed., p. 53; Morse on Banking, 4th ed., §§ 217, 223; Randolph on Commercial Paper, 2d ed., § 795; Cal. Civil Code, § 1531.

*Mr. E. S. McCord,* with whom *M. J. A. Kerr* was on the brief, for respondent.

MR. JUSTICE HUGHES delivered the opinion of the court.

The Russo-Chinese Bank brought this action to recover back money which it had paid to the National Bank of Commerce of Seattle. Judgment of non-suit was entered on the first trial and was reversed by the Circuit Court of Appeals. 187 Fed. Rep. 80. On the second trial, there was a verdict for the defendant and the judgment entered accordingly was affirmed. 206 Fed. Rep. 646. The case comes here on certiorari.

The facts are these: In December, 1903, the Centennial Mill Company, of Seattle, shipped by the steamship 'Hyades' of the 'Puget Sound-Oriental Line' 35,312 quarter sacks of flour to be transported to Port Arthur, or Dalny, and to be there delivered "unto shipper's order or to his or their assigns (Notify Clarkson & Co.)." In accordance with the usual course of business the Centennial Mill Company drew its draft, dated December 11, 1903, on Clarkson & Co., for $36,194.80, payable ninety days after sight, to the order of the National Bank of Commerce (with exchange and collection charges) and, attaching thereto the original and duplicate of the bill of lading for the shipment above described, (which was endorsed in blank) the policy of insurance, and bill of sale to Clarkson & Co., delivered the draft of the National Bank of Commerce, of Seattle, which paid the amount of the draft to the Mill Company. This bank then forwarded the draft, with the documents, to the Port Arthur branch of the Russo-Chinese Bank for collection, stating in the letter of transmittal: "Documents are to be delivered on payment." The letter, with the draft and documents, was received on January 22, 1904.[1] In acknowledging receipt, the Russo-Chinese Bank used the usual form of letter which stated that specific instructions must be given concerning disposition of bills and documents, and storage of goods, in case the draft were dishonored. No such instructions were given. The draft was presented for acceptance on January 23, 1904, and was accepted on January 30, 1904 by Clarkson & Co., and the Seattle bank was notified accordingly. The acceptance fixed April 30, 1904, as the due date, according to the tenor of the draft, and on the expiration of two days' grace allowed by the Russian law it was protested on May 3, 1904. There was evidence that the draft with

---

[1] For convenience, we give the dates 'New Style.'

deed of protest was mailed to the Seattle bank on May 26, 1904; and there was counter testimony that it never was received.

The Russo-Japanese War was formally declared on February 10, 1904. From February 9 there was a stringent water blockade of Port Arthur and about May 3 the investment was made complete by the Japanese land forces. Port Arthur fell on January 2, 1905, and thereupon the Japanese authorities took possession of all the books and documents of the Russo-Chinese Bank at Port Arthur; these were retained until March, 1906, when they were returned to the bank and taken to its home office at St. Petersburg.

Clarkson & Co., an importing firm having its principal place of business at Vladivostok and a branch office at Port Arthur, were also the agents at the latter place of the steamship company which carried the flour. On April 29, 1904, the Port Arthur branch of the Russo-Chinese Bank wrote to the Shanghai branch of the bank (in answer to an inquiry requested by a representative of the Centennial Mill Company) that the bank had "all shipping documents" and added: "The flour relative to the first three bills" (including the one in question) "is in the hands of Clarkson & Co. and has been sold by them. They promised to take up the bills as soon as they get the money of their sale . . . Bill No. 1559/7035 " (that is, the draft here involved) "is due tomorrow and shall be protested if not paid." It was further stated that the fact that Clarkson & Co. had obtained possession of the goods, although the bill of lading was held by the bank, was due to their being the steamship agents, and could not be prevented. On July 7, 1904, the Seattle bank wrote to the Russo-Chinese Bank at St. Petersburg that Clarkson had advised the drawer that this draft, and others, had been paid before maturity. The Russo-Chinese Bank replied, in substance, that it was not in a

position to trace the matter but would investigate it as soon as possible. There was further correspondence in which the Seattle bank set forth its information as to the payment of the draft and the Russo-Chinese Bank reiterated its inability to ascertain the facts. Finally, in response to the demand of the Seattle bank for the return of the bill of lading attached to the draft, or a remittance of its amount, the Russo-Chinese Bank, St. Petersburg, under date of November 9, 1904, forwarded to the Seattle bank a cheque for $36,013.70 (being $36,194.80 the face of the draft less commission and charges) and added: "It remains, of course, however understood that in case your above remittance proves not to have been paid for by Clarkson & Co. you are held responsible to refund the amount of our today's cheque." The Seattle bank (December 5) acknowledged receipt pointing out that a balance of $2,298.49 was still needed to make payment of principal and interest in full, and stating: "We on our part agree upon return to us of both sets of bills, showing that the draft has not been paid, to reimburse you in the sum paid us, provided, that we were in no wise injured by the fact that your Port Arthur Branch has indefinitely held the bills after their maturity, at which time they could have been returned to us and we could have collected from the Steamship Company." On December 29, 1904, the Russo-Chinese Bank, St. Petersburg, enclosed cheque for the balance requested, and said: "It remains understood that in case your above remittance proves not to have been paid, you declare yourselves ready to refund us these $2,298.49 with the $36,013.70, sent on 27/9 November plus accrued interest." And in reply the Seattle bank agreed "that guarantee contained in our letter of December 5 shall also cover this amount."

When the Russo-Chinese Bank obtained from the Japanese authorities the books and documents, it ascertained that the draft in question had been protested for non-

payment, and had been mailed to the Seattle bank.  Thereupon, on June 27, 1906, the Russo-Chinese Bank demanded the refunding of the money paid to cover the draft.  The demand was refused and this action was brought.

It was alleged in the complaint that the payment to the Seattle bank had been made upon condition that "if it should thereafter be ascertained that said draft had not been paid," the money should be refunded, and that there had been no payment in fact.  The defendant denied that the condition was as stated and alleged that it had agreed to reimburse the plaintiff upon the return 'of both sets of bills' and a showing that the draft 'had not been paid,' provided the defendant was in no wise injured by the negligence of the plaintiff in the performance of its duties.  It was further averred, among other things, that the draft had been paid in full by Clarkson & Co.; that it was the duty of the plaintiff not to permit the flour represented by the bill of lading to be appropriated by Clarkson & Co.; and that if the proceeds of the sale of the flour were not applied to the payment of the draft the failure was due to the plaintiff's carelessness and breach of duty.  The plaintiff in its reply denied these averments and alleged affirmatively that Clarkson & Co. were the agents of the steamship company and that it was well known to the defendant that upon arrival the flour would be delivered into their keeping as such agents whether the draft was paid or not, and that the appropriation of the flour by them before payment was a matter not within plaintiff's control.

The judgment of non-suit on the first trial, because of a failure to show the return of the draft and accompanying documents and thus to prove the breach of an express promise, was reversed upon the ground that the complaint stated a cause of action upon an implied agreement to restore money paid under mistake of fact.  187 Fed. Rep., p. 86.

On the second trial the jury found a general verdict in favor of the defendant and also returned a special finding as follows:

"We . . . find that the Port Arthur Branch of the Russo-Chinese Bank did receive the payment of the draft dated December 11, 1903, on account of which the plaintiff made the remittance to the defendant alleged in the complaint."

The Court of Appeals held that, notwithstanding the protest of the draft and the other evidence introduced by the plaintiff to show that it had not been paid, this special finding had sufficient support. In its succinct review of the evidence the court said, 206 Fed. Rep. 651:

"The flour in question was carried to Port Arthur by the ship Hyades, which reached there about the middle of January, 1904. The evidence also shows that Clarkson & Co. were large customers of the bank. The succeeding ship of the steamship company, also carrying flour among other things, reached Port Arthur about the 7th of February, 1904. Short" (assistant manager of Clarkson & Co. until, as he said, February 4, 1904) "testified, among other things, that when the Hyades arrived with the 35,312 quarter sacks of flour in question, there were but from 6,000 to 8,000 sacks in Clarkson & Co.'s warehouse, and that when that shipment arrived he went to the Port Arthur bank on behalf of Clarkson & Co. to accept the draft drawn for the purchase price of it, and did so; that when he accepted the draft Mr. Ofsiankin," (manager of the Russo-Chinese Bank at Port Arthur) "on behalf of the bank, authorized Clarkson & Co. to take immediate possession of the flour and sell it, and that he (Short) on behalf of that firm gave the bank what he designates as a 'letter of guaranty,' and what Davidson" (then, as he testified, manager of Clarkson & Co. at Port Arthur) "in his deposition designates as one of 'hypothecation,' recognizing the flour as the property of the bank until paid for, and

agreeing to pay over to the bank the proceeds thereof
until full payment was made; that the letter was 'the
regular form of bank guaranty; it was a printed form,' said
the witness.  And both Short and Davidson testified that
what was done in the matter of the shipment here in ques-
tion was in accordance with a long-established custom
between the Port Arthur bank and Clarkson & Co.; Short
testifying that: 'From the year 1900 the same rule existed.
We always gave the bank a letter of guaranty against—a
letter of guaranty to take delivery of the cargo, and the
cargo belonged to them until it was paid for, and we sold
it out and deposited the money in the bank from time to
time as Clarkson & Co. got it in.'—Davidson in his dep-
osition corroborates the testimony of Short in that re-
gard,—  . . .  .  Short testified that upon the acceptance
by Clarkson & Co. of the draft in question, and the
delivery by that firm to the Port Arthur bank of the
documents mentioned, Clarkson & Co. took possession of
the 35,312 quarter sacks of flour, and that they thereupon
commenced selling it, and paying into the bank the pro-
ceeds thereof, is a fair inference from his testimony, as
well as that of Davidson.—It appears from the latter's
testimony that by reason of orders of the Russian military
authorities he was compelled to leave Port Arthur, and
did so on the 17th of February, 1904." After referring to
the fact that Davidson was evidently confident that the
steamer that brought the flour was the 'Pleiades' (the
steamer that arrived in February after the 'Hyades')
the court continued, p. 652:—"but the flour itself, the
witness distinctly testified, was sold by him before leaving
Port Arthur to the firm of Ginsburg & Co., which he
testified was a large Russian firm doing an extensive
business with the Port Arthur bank, and with its principal
place of business at that place, and which sale he testified
he had to make in order to protect Clarkson & Co. against
the war conditions then prevailing.  His testimony is, in

part, that he arranged with Ginsburg & Co. to pay a part of the money for which he sold the flour into the Port Arthur bank, and to take a draft from that company on Shanghai in his favor, which he intended to pay into Clarkson & Co.'s branch at that place, and that he took the head of the firm, Ginsburg, to the Port Arthur bank, and explained to the manager of that bank the terms of the sale, to which he agreed.—Short testified that the Pleiades arrived at Port Arthur about the 7th of February, and that he himself left there on board of that vessel, and that not more than 1,500 or 2,000 sacks of flour were landed at Port Arthur from that ship, so that the jury might well have concluded that the 35,000 or 40,000 sacks of flour which Davidson thought were brought by the Pleiades was the consignment of flour that the Hyades carried to that port a few weeks before. As a matter of course that, and all other inconsistencies in the testimony of the various witnesses, as well as their veracity, were matters for the determination of the jury, in the light of all of the facts and circumstances of the case. Moreover, there was testimony tending to show that from the 1st of January, 1904, to November 23d of the same year, Clarkson & Co. paid into the Port Arthur bank 126,928 rubles and 97 kopeks." 206 Fed. Rep., pp. 651–653.

We agree with the Court of Appeals that the special finding of the jury was adequately supported. Error is assigned with respect to the following instruction to the jury:

"If you find from the evidence in this case that plaintiff permitted Clarkson Company to take over the flour under such an arrangement as the defendant claims with the stipulation that the plaintiff was the owner of the flour and with the agreement that Clarkson & Company would account to the plaintiff for the proceeds of the sale of the flour, then I instruct you that such action on the part of the plaintiff constitutes in law a payment of the draft in ques-

tion and the plaintiff cannot recover and your verdict
must be for the defendant."

It is said by the petitioner that "if we assume that the
Port Arthur branch did, contrary to its instructions, per-
mit Clarkson to take over the flour, then to the extent of
the value of the security that was thereby released it may
have been responsible." But, it is argued that "although
the bank did without warrant release the security," still
no damage resulted to the Seattle bank if Clarkson & Co.
were in fact able to pay their draft, and that there was
abundant evidence that Clarkson's financial standing in
Port Arthur at this time was good; and that in any event
the debt could not be deemed to be paid to a greater
extent than the value of the property. The trial court, it
is insisted, in effect directed a finding of payment, if the
jury found that the agreement was made as described,
regardless of this value.

This criticism of the instruction fails, we think, to take
proper account of its context. Immediately following the
words quoted, the court said:

"It is a general rule of law that where collateral security
is received for a debt with power to convert the security
into money, this is specifically applicable to the pay-
ment of such debt; the same person being the party to pay
and receive, no act is necessary and the law makes the
application. If the proceeds equal or exceed the amount
of the debt it is *de facto* paid; no action would lie for it,
and proof of these facts would support the defense of
payment. And if you find from the evidence in this case
that the plaintiff did consent to Clarkson taking over the
flour in question and consented to the sale of the same
by Clarkson & Company, and then Clarkson & Company
sold the flour in question and paid over the proceeds
thereof to the plaintiff, then such payment of the proceeds
of the sale of such flour to the plaintiff operated as a pay-
ment of the draft in question,—provided the proceeds

of the sale of the flour equaled the amount of the draft; and if such proceeds did not equal or exceed the amount of the debt then it was a payment *pro tanto*—that is a payment of so much of the said draft as the proceeds of the sale of the flour would pay of the same; and this is the law, notwithstanding the fact that plaintiff may have received the proceeds of the sale of said flour and placed the same to the credit of Clarkson & Company in its bank, and permitted Clarkson & Company to use said funds for other purposes."

In this, the trial judge made his meaning sufficiently clear. If the proceeds of the sale under the agreement were to be payment only if they 'equaled the amount of the draft' and otherwise were to be 'payment *pro tanto*,' plainly the agreement itself was not to be treated as constituting payment regardless of the value of the flour. Taking the instructions on this point in their entirety we think that their fair import was that the finding of payment in consequence of the stated arrangement was to be reached only in case the value of the flour was not less than the amount of the draft.

Moreover, the record does not disclose a controversy as to the value of the flour. The evidence as to this amply supported a finding that the flour was at least worth the amount of the draft, and indeed it could not. be said that a different conclusion would have had adequate support in the proof. Mr. Friedburg, officer of the Russo-Chinese Bank, testified that he did not know 'the price of the flour,' but that so far as he knew "during the siege of Port Arthur the price of flour was a little higher than before the outbreak of the war, but there was a lot of flour in the go-downs of the Government and no scarcity was felt of it." Mr. Clarkson testified, referring to the Ginsburg sale: "The first I heard was that the flour had been sold at two roubles a sack. I firmly believe at that time, that as war had broken out, the flour that

was in Port Arthur at the time was worth fully Rbls. 3.00 a sack, consequently I considered that any sale made at Rbls. 2. was at least one rouble below the market value. To the best of my knowledge and belief the selling price before hostilities commenced was from Rbls. 2.50 to Rbls. 2.60 a sack. . . . Acting under instructions from me, the bank in Port Arthur refused to let Ginsburg & Company have the flour at Rbls. 2.00, whereupon Ginsburg & Company agreed to pay Rbls. 2.40." Mr. Short when asked 'the market price of the flour' at the time he left said "it was selling from two forty to two sixty-five roubles a sack." Mr. Davidson testified that there was "no market price of flour at that time," but when asked whether "there were not two separate bills of sale" made by him to Ginsburg & Company for that flour, "one at 2. roubles and the other at 2.40 roubles" he answered that it was "quite true there were two prices" arranged by him and that "the lower price was sufficient to meet the draft." He added: "I made the sale to Ginsburg & Company at what I considered a fair market value under the circumstances, namely, that I had to leave Port Arthur and that there was no one there I considered eligible to succeed me. The profit was 20 to 25 per cent., as near as I can remember." It cannot be said that the evidence warranted a finding that the value of the flour was less than the amount of the draft.

The Russo-Chinese Bank received the draft, with documents attached, for collection. It was instructed that "Documents are to be delivered on payment." It was on these terms that it was entrusted with the bill of lading, endorsed in blank, which represented the flour. It was its plain duty not to permit Clarkson & Co., upon whom the draft was drawn, to have the control and disposition of the flour until the draft was paid. See *National Bank* v. *City Bank*, 103 U. S. 668, 670, 671. It is no answer to say that Clarkson & Co. were the agents of the steamship

company, for, while they might be able to obtain custody of the flour, it would only be in their capacity as such agents and without the right of disposition. Nor was the case altered by the acceptance of the draft, for the condition attached to the delivery of the flour with the *jus disponendi* was payment, not acceptance. If, in these circumstances, the bank entered into an agreement with Clarkson & Co., as was testified, that the latter were to take over the flour and sell it, promising to account for the proceeds, this was manifestly a misappropriation of the property and there arose in consequence liability to account for its value. This action was brought by the Russo-Chinese Bank to recover money which it had paid to the Seattle bank, and, with respect neither to the express promise to refund nor the promise implied in law, can it be said that the plaintiff was entitled to succeed if at the time of the payment to the Seattle bank it paid merely what it owed. There is no theory which permits it to recover, save that it paid under a mistake of fact, that is, that upon the actual facts it was not liable to make the payment it did make. If, however, it appeared that the value of the flour was equal to the amount of the draft, and it was found that the bank contrary to its instructions had permitted Clarkson & Co. to take and dispose of the flour, it would necessarily follow that the Russo-Chinese Bank was accountable to the Seattle bank to the amount of the draft and was in the same position, so far as the right of the Seattle bank against it was concerned, as if it had received the avails of the draft. It could not by an agreement in violation of its duty, invest Clarkson & Co. with the right of disposition, without accountability. The instruction, to which we have referred, affords no ground for reversal.

Error is also assigned with respect to the instruction to the jury that the Russo-Chinese Bank became invested with the title and ownership of the flour and that it could

not be excused from an obligation to account by saying that the flour had disappeared without its knowledge. It is argued that the relation between the banks was that of principal and agent, not of vendor and vendee; that it took the draft for collection. But the charge, as we view it, was not to the effect that the relation of vendor and vendee was created; but on the contrary it was distinctly stated to the jury that the Russo-Chinese Bank 'was obligated as an agent to act in good faith and protect the rights of the National Bank of Commerce in the collection of the draft,' and that as 'the agent' for the owner it 'was obligated to account for the amount of the draft, to account for the security which the bill of lading constituted.' In view of the special finding that the draft had been paid it is not necessary to inquire as to whether there would otherwise have been liability on the part of the plaintiff because of a failure to exercise reasonable care. The special finding, supported by adequate evidence, was based under the instructions of the court upon the transaction with Clarkson & Co. to which we have referred, and it must be deemed controlling. We find no instruction with reference to that transaction, or its legal effect if found to be as testified, which was prejudicial to the plaintiff.

Complaint is also made with respect to certain requests for instructions and rulings on the admission of evidence, but they are wholly without merit and it is unnecessary to review them. It is said that the Seattle bank suffered no loss because it had a guaranty from the Centennial Mill Company, but the Seattle bank in view of its relation to the commercial paper involved was entitled to demand an accounting from its correspondent, and on the same ground to resist this action for the recovery back of the money which it had received upon the draft.

As we discover no error in the record, the judgment must be affirmed.

*Judgment affirmed.*