### O'NEIL v. FIRST NAT. BANK OF LOVELOCK, NEV.
### No. 2586.

District Court, D. Nevada.
Feb. 10, 1936.

Hinsdale, Otis & Johnson, of Sacramento, Cal., and Le Roy F. Pike, of Reno, Nev., for plaintiff.

Roy W. Stoddard, of Reno, Nev., and John A. Jurgenson, of Lovelock, Nev., for defendant.

## NORCROSS, District Judge.

This is an action at law by plaintiff to recover the sum of $1,500, interest, and costs. Defendant denies liability. The issues raised by the pleadings and the questions of law presented upon the evidence submitted arise from the primary fact that on October 28, 1932, said California National Bank of Sacramento received from defendant a draft in the sum of $1,500, drawn by defendant the day previous on the Reno National Bank of Reno, Nev., and on its receipt credited the amount thereof on the account of defendant with said Sacramento Bank, and forwarded the same for collection to the Reno National Bank, which bank on October 29, 1932, charged the same upon the account of defendant with said Reno Bank but did not remit the amount thereof to the said Sacramento Bank. In this opinion and decision, for brevity the said banks will hereafter be respectively referred to as Sacramento Bank, Lovelock Bank, and Reno Bank.

At the date of said draft and for some time both prior and subsequent thereto, the Lovelock Bank carried a checking account with both the Sacramento Bank and the Reno Bank. Its account with the Sacramento Bank was opened February 2, 1930, at which time its cashier and two assistant cashiers signed in duplicate, and delivered one copy to the Sacramento Bank, an agreement reading:

"In receiving items for deposit or collection, this Bank acts only as depositor's collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited subject to final payment in cash or solvent credits. This Bank will not be liable for default or negligence of its duly selected correspondents nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence. This Bank or its correspondents may send its items, directly or indirectly, to any Bank including the payor, and accept its draft or credit as conditional payment in lieu of cash; it may charge back any item at any time before final payment, whether returned or not, also any item drawn on this Bank not good at close of business on day deposited.

"All items are forwarded without instructions to protest if unpaid unless this Bank is otherwise instructed.

"Items need not be presented through the clearing house or forwarded to outside points until the business day following the day of deposit.

"The California National Bank is hereby authorized to forward monthly statement by ordinary mail to the address below at the risk of the undersigned."

Accompanying the draft as mailed by the Lovelock Bank to the Sacramento Bank was a printed form designated "Cash Letter," containing among others the following instructions:

"Protest Instructions for Unpaid Items
"  *   *   *   Items over $1000.00 protest in all cases.

"Wire direct to this bank non-payment of items $500.00 or over."

On the date of receipt of the draft the Sacramento Bank mailed to the Lovelock Bank letters containing the statement:

"We credit your account with the following described items, subject to the conditions stated on the reverse side hereof.  *   *   *"

The conditions stated on the reverse side of the letter are the same as those

stated on the agreement of date February 2, 1930, supra.

The Reno Bank received the draft on Saturday, October 29, 1932. On that date the Lovelock Bank had on deposit with the Reno Bank an amount in excess of the draft. The Reno Bank and the Sacramento Bank were not correspondent banks, and neither of said banks had a deposit or checking account with the other. The Sacramento Bank was in the habit of sending to the Reno Bank such collection items as it might be called upon to forward from time to time. It was the custom of the Reno Bank, when it collected items which it received from the Sacramento Bank, to remit to the Sacramento Bank on the business day following the collection, such remittances being usually made by forwarding to the Sacramento Bank the draft of the Reno Bank on the Crocker First National Bank of San Francisco. On October 29, 1932, when the Reno Bank received the draft for $1,500 from the Sacramento Bank, it charged the amount on the balance in its hands standing to the credit of the Lovelock Bank, and said draft was by the Reno Bank marked, "Paid 10-29-32," and was forwarded to the Lovelock Bank together with a statement for reconcilement. The draft and statement were received by the Lovelock Bank on October 31, 1932, and the statement reconciled. Remittance was never made to the Sacramento Bank by the Reno Bank.

On October 31, 1932, the Lovelock Bank also received from the Reno Bank certain state warrants for collection in the sum of $8,998. It made collection thereof, and on November 2, 1932, issued its draft in favor of the Reno Bank on its account in the Federal Reserve Bank of San Francisco in the sum of $6,430.60, and on the following day, November 3d, mailed the same to the Reno Bank, which latter bank forwarded it to the said Federal Reserve Bank, and on November 5, 1932, said draft was by the Federal Reserve Bank charged to the account of the Lovelock Bank and credited to the account of the Reno Bank. The difference between the amount of the warrants, $8,998, and the amount of said draft, $6,430.60, represented the balance to the credit of the Lovelock Bank with the Reno Bank, after the Reno Bank had charged the Lovelock Bank with the said draft drawn by the Lovelock Bank in favor of the Sacramento Bank in the sum of $1,-

500. The settlement on account of the state warrants received and collected by the Lovelock Bank discharged its credit account with the Reno Bank.

Saturday, October 29th, was a half holiday; Monday, October 31st, was Admission Day in Nevada, and a bank holiday; November 1st to November 12th were by Governor's proclamation proclaimed to be bank holidays in Nevada. The Reno Bank did not open for public business between noon of Saturday, October 29, 1932, and November 12, 1932, nor thereafter under other proclamations of the Governor. It suspended on December 9, 1932, and on that day was taken over by the Comptroller of the Currency. The Lovelock Bank of Lovelock, Nev., did not observe the bank holidays or moratorium proclaimed by the Governor.

Not having received on November 1st any remittance from the Reno Bank, the Sacramento Bank on November 2d wired the Reno Bank as follows: "Wire fate our remittance Oct. 28th for $1759.18." (The $1,500 draft was one of the items composing the $1,759.18.)

On the same day the Reno Bank wired the Sacramento Bank as follows: "Refer wire today your remittance 10/28 $1759.18 and $584.46 holding for payment account Governor's Proclamation declaring moratorium letter follows."

On November 5th the Sacramento Bank wired the Lovelock Bank as follows: "We charge your account 1500 your draft of 10/27/32 on Reno National unpaid due to Bank holiday."

On November 7, 1932, the Sacramento Bank received a letter from the Lovelock Bank reading as follows:

"We have your telegram this morning to the effect that you are charging our account with $1500.00 covering the draft of the 27th on the Reno National Bank. This is draft No. 10283.

"We shall expect the return of this draft Monday morning, and upon its receipt by us shall be glad to credit your account with the amount."

Of date December 3, 1932, the assistant cashier of the Lovelock Bank signed a reconcilement of the statement of account rendered by the Sacramento Bank at the close of business December 1, 1932, showing a balance to the credit of the Lovelock Bank of $80.27. The statement of account rendered by the Sacramento Bank and re-

ferred to in the reconcilement contained both the debit and credit items concerning said draft for $1,500 entered respectively on October 28 and November 5, 1932. Business relations between the Sacramento Bank and Lovelock Bank were suspended on or about December 21, 1932. The account of the Lovelock Bank on that date according to the books of the Sacramento Bank showed an overdraft of $79.-01, which was not inclusive of a total amount in the sum of. $1,420.99 represented by seven cash letters sent by the Sacramento Bank to the Lovelock Bank, on December 13 to 19, inclusive. These cash letters represented items for collection to be made by the Lovelock Bank, which items were by it collected, retained, and credited to the Sacramento Bank on the books of account of the Lovelock Bank. It was stipulated by counsel for the respective parties that on December 31, 1932, the account of the two banks as shown by the books of the Sacramento Bank showed an overdraft of the Lovelock Bank in the sum of $1,500, while that of the Lovelock Bank showed the accounts of the two banks to be in balance, and that the difference in the two accounts was occasioned by respective charges in reference to the said draft of date October 27, 1932, on the Reno Bank for $1,500.

Defendant offered in evidence, among others, two exhibits, one being a copy of a letter from the assistant cashier of the Lovelock Bank of date December 21, 1932, in which appears the statement that it is in reply to a telegram from the Sacramento Bank in reference to the aforementioned cash letters of date December 13 to 19, 1932. We quote from this exhibit the following:

"Both of us know that matters hinge upon a certain remittance of $1500.00 sent you for credit on October 27th * * *.

"A careful review of the entire transaction indicates as follows: * * * The item we learn was in the hands of the Reno National Bank on October 29th——— and the first advice of its non-payment we had was on November 5th, 7 days after the item was in the hands of the Reno National."

The other exhibit above referred to was a letter of date December 23, 1932, from the vice president of the Sacramento Bank in reply to the said letter of date December 21st. The letter contained, among other statements, the following: "Wednes-day, November 2, no returns reaching our hands we traced our remittance and forwarded to you notice of no returns as per enclosed copy." The copy inclosed was a printed blank form designated "Notice of Non-Payment," the spaces filled in with typewriter, addressed to the Lovelock Bank, dated "Sacramento, Calif., Nov. 2, 1932," and reading:

"Please take notice that we have received no acknowledgment of our cash letter which contained the following items, credited to your account on Oct 28 1932 * * *.

"The California National Bank
"By R ......................"

The evidence does not disclose that any reply was made to said letter of date December 23d. A witness for defendant, Lovelock Bank, testified that the original of such "Notice of Non-Payment" was never received, nor any notice prior to the said telegram of date November 5, 1932. This testimony was not refuted. The case has been briefed upon the assumption that said telegram was the first notice given.

On January 21, 1933, the Sacramento Bank suspended business and was taken over by the Comptroller of the Currency. On October 24, 1933, the receiver of the Sacramento Bank verified a claim against the Reno Bank, as "Collecting Agent for the First National Bank of Lovelock Nevada," for the amount in controversy in this suit, being, as stated in the claim, for "Unremitted Collection No. Proceeds draft * * * forwarded for collection * * * October 28, 1932." The claim was on the same day filed with the receiver of the Reno Bank. A copy thereof was offered as an exhibit by plaintiff.

The concluding paragraph of defendant's answer and counterclaim briefly sums up the contention of defendant in respect to which the law governing the case is to be determined. The paragraph reads: "That by reason of the violation of the agreement in writing between said The California National Bank of Sacramento and defendant, and the negligence of said The California National Bank of Sacramento in failing, neglecting and refusing to wire defendant of non-payment to it by The Reno National Bank of Reno, Nevada, in accordance with instructions of defendant forwarded with said draft, de-

fendant was injured and damaged in the sum of $1500.00."

The provision of "the agreement in writing," between the Sacramento Bank and the Lovelock Bank, claimed by the latter to have been violated, was that said Sacramento Bank "assumes no responsibility beyond the exercise of due care." It is contended that this provision required the Sacramento Bank in the "exercise of due care" to give prompt notice of the failure to pay to it the draft, independent of the instruction in the cash letter of transmittal reading: "Wire direct to this bank non-payment of items $500.00 or over." This instruction it is contended, was binding upon the Sacramento Bank, irrespective of the said agreement of the parties with respect to "due care," and required the Sacramento Bank immediately upon receipt of notice of nonpayment to wire that fact to the Lovelock Bank.

It is also contended by the Lovelock Bank that said draft having been charged against its account on October 29th, remittance should have been made on that date to the Sacramento Bank, and not having been received by the latter bank on Monday, the 31st, following, notice thereof by wire should have been given by the Sacramento Bank on that date. While this question has been discussed at some length in the respective briefs, it is unnecessary to consider or determine it. The fact remains that the Sacramento Bank did on November 2d receive notice by telegram from the Reno Bank that remittance was not being made for the draft in question and other drafts, because of the Governor's holiday or banking moratorium proclamation. Had the Sacramento Bank on receipt of that telegram wired the Lovelock Bank as to the position taken by the Reno Bank, the Lovelock Bank would have been put upon inquiry respecting the position it should take in the matter of settlement with the Reno Bank on account of collection of the said state warrants. Had the Sacramento Bank so wired the Lovelock Bank on receipt of the Reno Bank's letter on the following day, November 3d, such wire, according to the testimony, would have been received in time for the Lovelock Bank to have protected itself by deducting the amount in question from its draft sent to the Reno Bank on account of the state warrants collected. No advice, however, was given until November 5th, on which date the draft of the Lovelock Bank in settlement of its account

with the Reno Bank was cleared through the Federal Reserve Bank of San Francisco.

It is contended by plaintiff that "the draft was paid on presentation by the drawee debiting the drawer's account; and so there never was any occasion calling for compliance with the said instruction, for the instruction is not an instruction requesting or requiring any report of any kind in case the draft should be paid by the drawee on presentation." No authorities are cited holding that the mere fact of "the drawee debiting the drawer's account" would be regarded as payment as that term is used in said instruction. The wire sent by the Sacramento Bank to the Lovelock Bank on November 5th stated that the draft was "unpaid due to Bank holiday," so from that it would appear there was no misunderstanding of what was meant by "nonpayment." In plaintiff's reply brief is set out the letter of the Reno Bank of date November 2d, referred to in the telegram of that date, in which letter appears the statement: "Owing to the * * * proclamation * * * we were unable to remit to you in payment of this cash letter." It is then stated in the brief that: "From this letter the Sacramento Bank learned that the draft had been paid, and that the delay in remitting for the money collected was due to * * * holidays (or moratorium) created by proclamation of the Nevada Governor." The letter, however, also states: "Payment of your remittance * * * was held over until our next business day."

The time that a check or draft is to be regarded as paid in view of the facts involved in a particular case presents an interesting and important question. The word "payment" appears to have both a broad and a restricted meaning dependent upon its use in respect to particular banking transactions. As provided by section 88 of the Uniform Negotiable Instrument Act (Comp.Laws Nev. § 4557): "Payment is made in due course when it is made at or after the maturity of the instrument to the holder thereof in good faith and without notice that his title is defective."

Courts in a few cases have had occasion to consider the status of a check or draft received through the mail, as in this case, and charged to the account of the drawer. Concerning this situation Paton's Digest, Legal Opinions and Banking Law, says: "In such case the reasonable

conclusion would seem to be—although it is to be regretted that the precise rule is not more clearly defined by the authorities —that where a check is received by the drawee in the mail, it * * * is to be deemed paid at the point of time when, * * * the check is charged to the account of the drawer and is cancelled. Thereafter the account is held by the bank as agent of the holder of the check and is beyond the control of the drawer or his right to stop payment, although remittance to the holder, * * * is not actually made until after notice not to pay is given by the depositor. After such charge to his account, the depositor has not the power to stop payment or to compel the bank to return the check unpaid and pay him the deposit." Paton's Digest, vol. 2, pp. 1385–1388, §§ 1227a, 1228a.

From the foregoing it appears that while receipt of a check or draft through the mail by the drawee bank and actual charge thereof against the account of the drawer and cancellation of the check or draft constitute payment thereof so far as the drawer is concerned so that payment thereafter may not be stopped, nevertheless it does not constitute payment in due course until actual receipt by the payee of the amount of money specified or equivalent credit.

▆▆▆ The agreement entered into between the two banks on February 2, 1930, authorized the Sacramento Bank to "charge back any item before final payment, whether returned or not." The expression "final payment," as there used, clearly means something more than a mere charge on the books of the drawee bank against drawer bank and cancellation of the check or draft. As said in plaintiff's brief: "Final payment means, of course, payment to the Sacramento bank." The important matter respecting both the Sacramento and Lovelock Banks was ultimate credit which could only be obtained upon payment in due course. For the same reasons the instruction in the cash letter, "Wire * * * non-payment of items," meant anything which affected payment in due course.

It is further contended in the briefs for plaintiff that, "even if negligence was proved, there was no evidence that it was the proximate cause of damage to defendant or that defendant suffered damage." In support of this contention it is asserted that: "If defendant can escape from being required to repay to the Sac-

ramento bank that $1500 which the Sacramento bank advanced to it, then the Lovelock bank will be ahead not only by that $1500 but also by its claim against the Reno bank." The brief further states: "The claim of defendant against the Reno bank is a preferred claim and as such entitled to payment in full before general creditors are paid anything," citing authorities. The only claim which from the evidence appears to have been made against the Reno Bank is that made by plaintiff. If correct in the legal contention that such claim is preferred, a question not now before the court, then the plaintiff cannot suffer material injury. It is manifest also that defendant could not both recover from the Reno Bank and fail to credit an equal amount to the Sacramento Bank.

The briefs of the respective parties comment upon the letter of the Lovelock Bank of date November 5, 1932, in reply to the telegram of the Sacramento Bank of that date. It is true the letter makes no claim of any delay in notice, or injury resulting therefrom. In plaintiff's opening brief appears the statement: "It would seem that the writer of this letter was totally oblivious to the clause just quoted," referring to the provision in the agreement, "it may charge back any item at any time before final payment, whether returned or not." It does not appear to be contended, however, that anything in the letter affects the two main contentions of defendant of injury to it resulting from lack of "exercise of due care" or failure to comply with instructions to "wire in the event of non-payment." The letter is not referred to in plaintiff's closing brief.

▆▆▆ It is the conclusion of the court that both the "exercise of due care," as provided in the contract entered into between the two banks, and the instructions in the "cash letter" of the Lovelock Bank "to wire direct to this bank nonpayment of items $500.00 or over," required the Sacramento Bank not later than November 2d to wire the Lovelock Bank that the draft was unpaid so far as the Sacramento Bank was concerned, and the reason given therefor, and that failure to so wire under the facts of this case is a defense to the action. Exchange Nat. Bank v. Third Nat. Bank, 112 U.S. 276, 5 S.Ct. 141, 28 L.Ed. 722; Milwaukee National Bank v. City Bank, 103 U.S. 668, 26 L.Ed. 417; Washington Loan & Banking Co. v. Fourth Nat. Bank (C.C.A.) 38 F.(2d) 772; Smith

v. National Bank of D. O. Mills & Co. (C.C.) 191 F. 226; Carpenter v. National Shawmut Bank (C.C.A.) 187 F. 1; 7 C. J. 609; 1 Daniel on Negotiable Instruments, §§ 327–329; 2 Paton's Digest, § 1468a, pp. 1474, 1475.

Judgment for defendant.